

**COUNSELORS AT LAW**
**146 ROUTE 34**
**SUITE 325**
HOLMDEL, NEW JERSEY 07733

(732) 476-2660   FAX (732) 946-7248

INFO@GREENBAUMLAW.COM
WWW.GREENBAUMLAW.COM

ROSELAND OFFICE:
75 LIVINGSTON AVENUE
SUITE 301
ROSELAND, NJ 07068-3701
(973) 535-1600
FAX (973) 535-1698

WOODBRIDGE OFFICE:
P.O. BOX 5600
WOODBRIDGE, NJ 07095
DELIVERY ADDRESS:
METRO CORPORATE CAMPUS I
99 WOOD AVENUE SOUTH
ISELIN, NJ 08830
732-549-5600

CHRISTOPHER D. ADAMS
CHAIR, CRIMINAL DEFENSE & REGULATORY COMPLIANCE GROUP
(732) 476-2692 - DIRECT DIAL
(732) 476-2693 - DIRECT FAX
CADAMS@GREENBAUMLAW.COM

September 10, 2020

*VIA ECF*
Hon. Ann Marie Donio, U.S.M.J.
Mitchell H. Cohen Building
& U.S. Courthouse
4th and Cooper Streets
Camden, NJ 08101

      Re: **United States v. Andrew Drechsel**
           **Mag. No. 20-1044(AMD)**

Dear Judge Donio:

      On August 4, 2020, Andrew Drechsel ("Mr. Drechsel") was arrested at his home in St. Cloud, Florida on the above referenced complaint. Mr. Drechsel was brought before United States Magistrate Judge Gregory Kelly in the Middles District of Florida and detained until he could be presented in this district for an initial appearance. An Order of Removal was then entered and Mr. Drechsel began his long transport to the District of New Jersey. [ECF 5]. Mr. Drechsel arrived in this district on August 31, 2020 and is housed in the Essex County Correctional Facility. Mr. Drechsel hereby renews his motion for bail under the following combination of conditions:

      1. Pretrial Services Supervision;
      2. Home Incarceration at his home at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ with electronic GPS monitoring: 24-hour lock-down except for court appearances or other activities specifically approved by the court/PTS;
      3. $250,000 personal recognizance bond signed by three financial responsible co-signors;
      4. For the purpose of Location Monitoring, the defendant shall install a land line telephone in his/her residence within 5 days of release, unless waived by Pretrial Services;

6474842.2

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 2

5. Surrender all passports/travel documents. Do not apply for new travel documents (Mr. Drechsel's United States Passport is in the possession of counsel);
6. Three (3) Third Party Custodians:
    a. **April Beckner** 



    b. **Laura Haggerty**

    c. **Amy Miller Beckner**

7. Substance abuse testing and/or treatment as directed by Pretrial Services.
8. Prohibition from using the internet except to communicate with Counsel or otherwise permitted by the Court/PTS.
9. Maintain current residence .
10. No victim contact.

For the reasons presented below, I respectfully submit that Mr. Drechsel's release on bail, with this strict combination of conditions is warranted.

1. <u>Applicable Law</u>

The Bail Reform Act requires the release of a defendant on the "least restrictive" conditions necessary to "reasonably assure the appearance of the person as required and the safety of any other person and the community." *See* 18 U.S.C. § 3142(g). To that end, a court "shall order the pretrial release of a person on personal recognizance, or upon the execution of an unsecured appearance bond in an amount specified by the court, … unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b)

6474842.2

(emphasis added). Both the Bail Reform Act and case law make clear that it is only a limited group of offenders who should be denied bail pending trial.

Mr. Drechsel was charged by criminal complaint with having a sexual relationship with a 15-year-old female victim in 2015 and 2016, in violation of 18 U.S.C. § 2422(a) and (b); 18 U.S.C. § 2423(b), and 18 U.S.C. § 2251(a) and (e). The defense acknowledges that the § 2422(b) charge carries a rebuttable presumption for detention. Nonetheless, the defendant bears a limited burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight. *United States v. Perry*, 788 F.2d 100, 114-15 (3d Cir. 1986). Furthermore, even in a case such as this, the Government is still required to establish that no assortment of bail conditions will assure the defendant's presence and the safety of others. *See* 18 U.S.C. § 3142(e), (f). The Act's provisions "effectively limit judicial consideration . . . to two relevant criteria: the risk that the defendant will flee and the risk that he will pose a danger if admitted to bail." *See United States v. Provenzano*, 605 F.2d 85, 93 (3d Cir. 1979) (addressing similar criteria in the context of a bail pending appeal application pursuant to 18 U.S.C. § 3143, in which the standard for release is even higher than that imposed in connection with a bail pending trial application pursuant to 18 U.S.C. § 3142). In addition, the Act "imposes a duty on federal courts not only to determine whether an applicant poses such risks, but also to measure them "in terms of conduct that cannot be reasonably safeguarded against by an imposition of conditions upon the release." *Id*. at 93-94.

When making a determination regarding the eligibility of a defendant for pretrial release (whether on personal recognizance, an unsecured appearance bond, or conditions), the Bail Reform Act directs that the following factors must be considered:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 4

*Id.*

If a judicial officer determines that release upon personal recognizance or upon execution of an unsecured appearance bond "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person" subject to the conditions that the person not commit a crime during the period of release, cooperation in the collection of a DNA sample if such a collection is authorized, and "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id*. § 3142 (c) (emphasis added).

Thus, I respectfully submit that, after an analysis of each of the statutory factors set forth in 18 U.S.C. § 3142(g), together with the proffered bail package, Mr. Drechsel will be able to satisfy his "limited burden of production" and the Government will be unable to satisfy any prong of its burden of persuasion, namely, that he presents a danger to the community or risk of flight that no assortment of bail conditions cannot eliminate.

2. Bail Package

The defense respectfully submits that Mr. Drechsel should be released on a $250,000 personal recognizance bond signed by three financially responsible co-signers, who will also serve as his third party custodians.[1] In addition, Mr. Drechsel should be released to April Beckner to live at their residence in St. Cloud, Florida with their son and Ms. Beckner's mother, both of whom will act as third party custodians in addition to Mr. Drechsel's mother who lives nearby. GPS location monitoring and home detention, together with the surrender of his passport and prohibitions against the use of the internet and other PTS supervision concludes this bail package, which the defense submits is the most strict combinations of conditions of release imaginable. These conditions are more than adequate to ensure Mr. Drechsel's appearance at all future Court appearances and to protect the community. *See* 18 U.S.C. § 3142(c).

When evaluating the statutory factors, Mr. Drechsel is a candidate for release:

1. He has no prior record and this is his first involvement with the justice system.

---

[1] Contact information for these co-signors and third-party custodians has been provided to Pretrial Services and to the Government for approval.

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 5

2. He is physically and mentally sound. Mr. Drechsel previously competed in and won the American Ninja Warrior ("ANW") competition in 2016, 2018 and 2019.[2]

3. Mr. Drechsel enjoys strong family ties to his mother, brother and sister. He lives with his partner in life for the past nearly 10 years, April Beckner and their 9-month-old son, Korey. They bought their home together to raise their son and future family.

4. He is financially secure insomuch as he has earned cash prizes from the ANW competitions, and he owns two gym businesses and earns residuals from three other gym franchises.

5. He has no history relating to drug or alcohol abuse.

6. There are no factors that would give rise to concerns that Mr. Drechsel would not appear at court proceedings. To the contrary, Mr. Drechsel learned of this investigation long before the charges were unsealed, engaged counsel and interacted with the government. He has proven himself responsible and willing to appear.

7. Mr. Drechsel was not on probation or parole, or on other release pending trial, sentencing, appeal, or completion of sentence for any offense at the time of the alleged conduct or arrest.

I respectfully submit that an analysis of each of the statutory factors set forth in 18 U.S.C. § 3142(g), together with the proffered bail package and any additional condition of release that this Court believes appropriate, demonstrates that the Government will be unable to meet its burden of proof that Mr. Drechsel presents a flight risk or danger to society, which cannot be ameliorated by any combination of conditions.

3. Mr. Drechsel is Not a Flight Risk

The strength of Mr. Drechsel's bail package is significant. The co-signors are financially responsible, and each share a personal relationship with him. Their income and assets will provide adequate collateral for the proposed bond and the co-signer's connection to Mr. Drechsel provides the moral suasion necessary for the Court's issuance of a bail.

---

[2] American Ninja Warrior is an American sports entertainment competition based on the Japanese television series Sasuke. It features hundreds of competitors attempting to complete series of obstacle courses of increasing difficulty in various cities across the United States, in hopes of advancing to the national finals and becoming the season's "American Ninja Warrior." To date, only Mr. Drechsel and two other have finished the course and achieved "total victory". Mr. Drechsel and one other are the only competitors to win the cash prize. *See* https://en.wikipedia.org/wiki/American_Ninja_Warrior; see also https://www.americanninjawarriornation.com/2019/9/16/20859688/american-ninja-warrior-all-last-ninjas-standing-winners-who-won.

6474842.2

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 6

4. Mr. Drechsel is Not a Danger to the Community

    Mr. Drechsel comes before this Court presumptively innocent and easily able to carry his burden of production to establish that he should be released on bail. The criminal complaint in this case alleges that Mr. Drechsel had a relationship with this female victim in 2015 and 2016 when she was 15 and 16 years old, respectively. I believe the Government will concede that it does not consider Mr. Drechsel a sexual predator. Given this circumstance, if under 24-hour home confinement and no internet usage, Mr. Drechsel would lack the ability to engage in any such conduct. Without any contact with the world outside his home he is not a danger to the community.

    The Government will no doubt detail the strength of its case against Mr. Drechsel, citing facts that the defense cannot possibly refute at this stage of the proceedings, including information obtained from the alleged victim and search warrants executed on electronically stored information ("ESI"). That is but only one factor to be considered, though.

5. Health Crisis Created by COVID-19 Pandemic

    **a.** The ECCF remains unprepared for the coronavirus outbreak

    Inmates at the ECCF – a pretrial detention facility housing state and federal detainees – are at serious risk of contracting the virus. These detainees are unnecessarily living through an unprecedented challenge presented by the COVID-19 pandemic. After almost seven months of prolonged lockdowns, substandard medical care, inadequate access to even the most basic of personal protective equipment ("PPE"), and exposure to unhygienic conditions, there is no end in sight to the dangers posed by COVID-19. *See Rafael L.O. v Tsoukaris* No. 20-3481, 2020 WL 1808843, *7-8 (D.N.J. Apr. 9, 2020) (Judge Vasquez noting the terribly conditions for inmates at ECCF and ordering inmates released). But perhaps the greatest challenge lies ahead for Mr. Drechsel if he is detained pretrial at the ECCF for an indeterminate time.

    During this crisis, the defense submits that courts should examine pretrial release in a different way. Holding inmates for extending periods awaiting trial – often in unsanitary conditions, under prolonged periods of lockdowns (similar to solitary confinement), with little to no access to communication (with family), programming, rehabilitative resources, or even basic healthcare – is greater than necessary. Moreover, detaining inmates like Mr. Drechsel, where he is at significantly greater risk of contracting COVID-19 and is subsequently at greater risk of serious illness or death, appears to be greater than necessary to accomplish the goals of bail.

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 7

    According to the Center for Disease Control and Prevention, ("CDC"), social distancing is simply "impossible to achieve in our federal prisons"– particularly during a lockdown.[3] Incarcerated individuals share bathrooms, sinks, showers, and telephones. They eat together and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings.[4] Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout detention centers.

    Unfortunately, as COVID-19 ravages jails, ECCF's ability to provide effective medical care has only gotten worse. Because ECCF has failed to implement large-scale testing, it cannot effectively identify and isolate people with the virus from those who are healthy. Testing capabilities vary from facility to facility[5] and ECCF has failed to implement a testing and isolation protocol for its staff.[6] ECCF has also failed to provide incarcerated individuals and staff adequate PPE to curb the spread of the virus. The stark reality is that avoiding exposure to COVID-19 is impossible for most detainees and inmates.

    As of today, the new strain of coronavirus that causes COVID-19 has infected over 28,177,569 people, leading to at least 910,610 deaths worldwide, 6,559,509 infected in the US

---

[3] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, *et al*., to President Trump (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also CDC*, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://bit.ly/2M9IF6a (last visited May 28, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

[4] *See, e.g.*, Fed. Bureau of Prisons, *BOP Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp(last visited May28, 2020) (allowing three showers a week); Likewise, the education about hygiene and social distancing [BOP]tout[s] is only effective if the inmates have the supplies and physical space to put such knowledge into practice."); Facility Evaluation: Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 20-cv-1590 (E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Detainees [at MDC Brooklyn] do not have access to adequate cleaning solutions or personal protective equipment.");

[5] *See, e.g.*, *United States v. Scparta*, --- F. Supp. 3d ---, 2020 WL 1910481, at *2 (S.D.N.Y. Apr. 20, 2020) (acknowledging confirmed COVID-19 cases on BOP's website but recognizing that "[t]esting in BOP facilities is severely limited, however, and the real numbers are likely far higher").

[6] Luke Barr, *Over 5,000 Corrections Officers Have ContractedCOVID-19*, ABC News (May 5, 2020), https://abcn.ws/2zlB8hG ("staffare typically tested in the community"); *see also* AFGE,*A BOP Officer Contracted Coronavirus. He was Told to Return to Work ASAP* (May 4, 2020), https://bit.ly/35KSCjA ("The Bureau of Prisons only tested inmates, not staff.").

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 8

with 195,590 deaths, and in New Jersey, 198,551 infected and 16,131 deaths.[7] On March 9, 2020, Governor Murphy declared a State of Emergency and a Public Health Emergency in response to novel coronavirus outbreak in relation to COVID-19. *See* https://www.nj.gov/governor/news/news/562020/20200309b.shtml (last accessed April 14, 2020). On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[8] As a result, several protective measures have been taken to slow the rate of infection, including limiting social gatherings, closing non-essential businesses, and ceasing in-person instruction for schools.[9]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19 — adults over 60 years old and people with chronic medical conditions, such as lung disease, heart disease, obesity and diabetes - take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[10] Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[11] Inmates cycle in and out of detention facilities from all over the world, the country, and the state, and people who work in the facilities, including correctional officers, and care and service providers, leave and return daily, generally without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited.[12] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. Per public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these

---

[7] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

[8] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS (last accessed April 14, 2020).

[9] *Governor Murphy Announces Statewide Stay at Home Order, Closure of All Non-Essential Retail Businesses* (March 21, 2020) https://www.nj.gov/governor/news/news/562020/20200320j.shtml (last accessed April 14, 2020).

[10] *People at Risk for Serious Illness from COVID-19*, CDC (April 2, 2020) *at* https://bit.ly/2VlYcny (last accessed April 14, 2020).

[11] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910. (last accessed April 14, 2020).

[12] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf (last accessed April 14, 2020).

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 9

settings."[13]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons addressed a high number of cases.[14]

Steps are already being taken in some jurisdictions to facilitate the release of at-risk prisoners and to reduce jail populations by discouraging and refusing the admission of individuals arrested on non-violent misdemeanor charges.[15]  In a series of unprecedented steps, Attorney General William Barr has issued guidance to Justice Department components urging the transfer of vulnerable inmates to home confinement and to "consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic."[16]

Chris Beyrer, MD, MPH, Professor of Epidemiology at the Johns Hopkins Bloomberg School of Public Health, has certified in relation to this issue that "COVID-19 poses a serious risk to inmates and workers in detention facilities" and that "[r]eleasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole." *See* Attached Certification of Dr. Beyrer.

Dr. Jonathan Louis Golob, Assistant Professor at University of Michigan School of Medicine at Ann Arbor and a specialist in infectious disease, certified in relation to this issue that vulnerable people living in an institutional setting are "at grave risk of severe illness and death from COVID-19." *See* Attached Certification of Dr. Golob.

---

[13] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS (last accessed April 14, 2020).

[14] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY (last accessed April 14, 2020).

[15] In New York Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners (Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) *at* (last accessed March 19, 2020)https://theappeal.org/sentenced-to-covid-19/.) (last accessed March 19, 2020); Cuyahoga County (Ohio) is holding mass pleas and bail hearings to reduce the current jail population (https://www.cleveland.com/court-justice/2020/03/cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html) (last accessed March 19, 2020); Mahoning County (Ohio) jail is refusing all non-violent misdemeanor arrestees (https://www.wkbn.com/news/coronavirus/mahoning-county-jail-refusing-some-inmates-due-to-coronavirus-outbreak/) (last accessed March 19, 2020); see also Collin County (TX) (https://www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/)    (last accessed March 19, 2020);

[16] *See* Memorandum from Att. Gen. William Barr to Dir. of Bur. of Prisons (April 3, 2020) https://bit.ly/2XCAXbB (last accessed April 14, 2020); Memorandum from Att. Gen. William Barr to All Heads of Dep't Component and U.S. Attorneys (April 6, 2020) https://www.justice.gov/file/1266901/download (last accessed April 14, 2020).

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 10

Robert B. Greifinger, M.D., a medical expert who has managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system and currently monitors the medical care in three large county jails for Federal Courts, certified in relation to this issue that:

> Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.
>
> * * *
>
> In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage.

*See* Attached Certification of Dr. Greifinger.

Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut, who has worked for over a decade on infectious diseases in the context of jails and prisons, certified in relation to this issue that "[t]he risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected" and that "it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community." *See* Attached Certification of Dr. Meyer.

Dr. Meyer further certified that it was her "strong opinion that individuals who can safely and appropriately remain in the community not be placed in ICE's NYC-area jails at this time." *See* Attached Certification of Dr. Meyer.  Dr. Meyer was "also strongly of the opinion that individuals who are already in those facilities should be evaluated for release." *See* Attached Certification of Dr. Meyer.

6474842.2

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 11

　　　Dr. Mark Stern, formerly the Assistant Secretary for Health Care at the Washington State Department of Corrections, certified in relation to this issue that "[f]or detainees who are at high risk of serious illness or death should they contract the COVID-19 virus, release from detention is a critically important way to meaningfully mitigate that risk. Additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility." *See* Attached Certification of Dr. Stern.

　　In a "Joint Statement from Elected Prosecutors on Covid-19 and Addressing the Rights and Needs of those in Custody," dated March 2020, a group of elected prosecutors proffered the following recommendations:

- Adopt cite and release policies for offenses which pose no immediate physical threat to the community, including simple possession of controlled substances.

- Release all individuals who are being detained solely because they can't afford cash bail, unless they pose a serious risk to public safety.

- Reduce the prison population to minimize sharing of cells and ensure that there are sufficient medical quarantine beds, and enough staff, to promote the health and safety of staff, those incarcerated, and visitors.

- Identify and release the following people immediately, unless doing so would pose a serious risk to the physical safety of the community:

    o Individuals who are elderly;

    o Populations that the CDC has classified as vulnerable (those with asthma, cancer, heart disease, lung disease, and diabetes);

    o People in local jails who are within 6 months of completing their sentence; and

    o People incarcerated due to technical violations of probation and parole.

- Put in place procedures and advocate for reforms that enable past lengthy sentences to be revisited and support release for those individuals who can safely return to the community.

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 12

*See* Attached "Joint Statement from Elected Prosecutors On COVID-19 and Addressing the Rights and Needs of those in Custody."

The Hon. Alison J. Nathan, District Judge for the S.D.N.Y., recently granted an emergent bail motion finding, in part, that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop." *United States of America v. Dante Stephens*, No. 15-cr-95 (AJN), unpub. op. (S.D.N.Y March 18, 2020). In *Rafael L.O. v. Tsoukaris*, Judge Vasquez found that the conditions of confinement at Essex County Correctional Facility, including the volume of ICE detainees confined to inherently limited living and sleeping quarters, limited access to hygiene products, shared bathroom facilities, and the transmission of COVID-19 to detainees in custody, amounted to punishment of the petitioners, who had underlying medical conditions that made them vulnerable to serious complications or death if they contract the virus. *See Rafael L.O.,* No. 20-3481, 2020 WL 1808843, *7-8. Judge Arleo similarly held that HCCC is in the same category and "severe complications and death [can occur] if they contract COVID-19 [since they] are incarcerated in Facilities at the epicenter of the outbreak where they cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene to stop the spread of the virus." *Cristian A.R. v. Decker*, No. 20-3600 (MCA), *8. (D.N.J. Apr. 12, 2020).

Other courts in this district have recognized that the treat of COVID-19 to inmates in prison constitutes an "extraordinary and compelling" reason to reduce sentences by granting compassionate release pursuant to 18 U.S.C. § 3852(c)(1)(A). *See, e.g.*, *United States v. Hakeem Gentry*, 19-78 (CCC); *United States v. John Bennett*, 09-656 (SDW) (pre-COVID); *United States v. Hyshawn Butler*, 16-080 (CCC) (filed pre-COVID; granted post-COVID); *United States v. Brent Pettit*, 03-845 (AET) (would have been released within a month if not granted CR); *United States v. Roeder*, No. 20-1682, 807 Fed.Appx. 157, 159-60, 2020 WL 1545872 (not precedential) (3d Cir. Apr. 1, 2020) (reversing District Court's denial of delayed self-surrender to FCI Allenwood). Most recently, on July 2, 2020, U.S. Chief District Judge Wolfson, in *United States v. McCalla*, 2020 WL 3604120 (D.N.J. July 2, 2020), granted compassionate release to a defendant to home confinement who was convicted for drug trafficking and weapons possession and served 75% of a 120-month sentence, because his asthma, obesity, and high-blood pressure placed him at a high risk for COVID-19. And, indeed, courts throughout the country have recognized that the treat of COVID-19 to inmates. Across the river, in the SDNY and EDNY, there have been hundreds of cases granting compassionate release based on COIVD-19 concerns.

Conclusion

Mr. Drechsel respectfully submits that he has clearly and convincingly demonstrated that he poses no threat to the community nor risk of flight; at an absolute minimum the defense has certainly met its "limited burden" of production. The burden of proof now shifts to the

Hon. Ann Marie Donio, U.S.M.J.
September 10, 2020
Page 13

Government.  For all of the reasons expressed above, the defense respectfully submits that the Government will be unable to carry its much more onerous burden to establish that Mr. Drechsel in fact presents a danger to the community or a serious risk of flight that cannot be eliminated through the proposed conditions of release.  Accordingly, the defense respectfully requests that the Court release Mr. Drechsel on the proposed bail package.

                                      Respectfully yours,

                                      CHRISTOPHER D. ADAMS

cc:    AUSA Alisa Shver
        USPTS Officer Wayne Webb

6474842.2