## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **CRISTIAN A.R., et al.,** | |
| *Petitioners*, | Civil Action No. 20-3600 |
| v. | **OPINION** |
| **THOMAS DECKER, et al.,** | |
| *Respondents.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Petitioners Cristian A.R., Fedor B., Santiago C.C., Noe C.M., and Alvaro N.M. (collectively, "Petitioners") are individuals in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") who are detained at facilities in New Jersey under ICE's discretionary authority pursuant to 8 U.S.C. § 1226(a). On April 6, 2020, Petitioners filed an Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 and an Emergency Motion for Temporary Restraining Order ("TRO") under Federal Rule of Civil Procedure 65, requesting the Court order their immediate release from detention based on their vulnerability to severe illness or death if they contract the novel coronavirus disease 2019 ("COVID-19"). ECF Nos. 12 (the "Petition") & 13. Respondents oppose the Motion. ECF No. 20. Having reviewed the Petition and the parties' submissions, heard oral argument, and examined the applicable law, the Court grants Petitioners' TRO and orders Respondents to immediately release Petitioners subject to the conditions set forth below.

## I.    FACTUAL BACKGROUND

### A.    COVID-19

The international community is in the grips of a rapidly-evolving health crisis.  On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[1]  Around that time, the United States had reported only seventy confirmed cases of COVID-19.[2]  As of the date of this writing, that number has since risen to over 492,416, and the virus has taken a total of 18,559 lives nationally.[3]  New York and New Jersey have the greatest number of infections and deaths in the nation.  Just yesterday alone, Saturday, April 11, 2020, New Jersey reported 3,599 new confirmed cases and 251 new deaths.[4]  Bergen County and Hudson County, where Petitioners are detained, are the epicenter of the virus in New Jersey.

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and from contact with contaminated surfaces.[5]  The most common symptoms of COVID-19 include fever, cough, and shortness of breath, but one need not present any symptoms to have the virus or be contagious.[6]  Certain individuals are at higher risk for severe

---

[1] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Apr. 12, 2020).

[3] Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 12, 2020).

[4] Presently New Jersey has 61,850 confirmed cases and 2,350 deaths.  *COVID-19 Information Hub*, STATE OF NEW JERSEY, https://covid19.nj.gov/#live-updates (last visited April 12, 2020).

[5] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 12, 2020).

[6] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Apr. 12, 2020).

illness or death if they contract COVID-19.   Among them are persons who are "older," are immunocompromised, or who have underlying health issues like asthma, chronic lung disease, HIV, heart conditions, diabetes, chronic kidney disease, and liver disease.[7]   There is presently no vaccine to prevent COVID-19 infections.[8]   In addition, testing is insufficient, especially in New Jersey, which ranks second in the country for confirmed cases but "19th in testing per capita."[9] The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing cloth face covering to curtail the spread of the virus.[10]

Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[11]   But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates.   The Declaration of Robert B. Greifinger, M.D., attached to Petitioners' motion, provides a glimpse into that reality.   Dr. Greifinger has "worked in health care for prisoners for more than 30 years" and has served as an independent consultant on prison and jail health care for several government agencies, including DHS.   Greifinger Decl. ¶¶ 1-2, ECF No. 13.1.   He describes the conditions that make detention facilities particularly susceptible to COVID-spread: the centers are "enclosed" and crowded environments; detainees are placed in "closed quarters" and share toilets, sinks, and showers "without disinfection between use"; "[s]taff arrive and leave on a shift basis"; and many

---

[7] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 12, 2020).

[8] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited Apr. 12, 2020).

[9] *N.J. Says It's Leading the Way in Coronavirus Testing. The Data Tells a Different Story*, NJ.COM (Mar. 29, 2020), https://www.nj.com/coronavirus/2020/03/nj-says-its-leading-the-way-in-coronavirus-testing-the-data-tells-a-different-story.html.

[10] Ctrs. for Disease Control and Prevention, *supra* note 8.

[11] *Id.*

facilities "lack adequate medical care infrastructure," like full-time, on-site physicians. *Id.* ¶ 10. The CDC has similarly explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *See* CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2, ECF No. 20.1.   Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult.   Detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings. *See* Greifinger Decl. ¶ 5 (observing that "preliminary data from China" indicates that "20% of people in high risk categories who contract COVID-19 have died").

The COVID-19 pandemic's effect on our immigration system stretches beyond the country's detention centers.   On March 18, 2020, the Executive Office of Immigration Review ("EOIR") postponed all non-detained hearings scheduled through May 1.[12]   Immigration courts have closed intermittently across the country.[13]   On March 27, 2020, soon after experiencing a one-day closure due to a confirmed COVID-19 case, the Varick Immigration Court in New York moved all of its cases to an adjudication center in Fort Worth, Texas, which were scheduled to be brought before immigration judges ("IJs") in remote hearings. *See* Status Report, *Jovel v. Decker*, 20-cv-308 (S.D.N.Y. Apr. 3, 2020) (the "*Jovel* Status Report") at 2, Haas Decl., Ex. 3, ECF No. 22.6.   Since transitioning remotely to Fort Worth, New York-area attorneys have reported administrative and operational setbacks, including IJs not receiving evidentiary submissions or

---

[12] U.S. Dep't of Justice, *EOIR Status During Coronavirus Pandemic*, *https://www.justice.gov/eoir/eoir-operational-status-during-coronavirus-pandemic* (last visited Apr. 12, 2020).

[13] The EOIR has used Twitter to notify the public of court closures. *See generally* @DOJEOIR, TWITTER (last visited Apr. 12, 2020).

having case files, attorneys being unable to secure clients' appearances due to detention facility "lockdowns," and unexpected hearing cancellations.  *See, e.g.*, *Jovel* Status Report at 2-4; Status Update, *Aguilar Garcia v. Decker*, 20-cv-1689 (D.N.J. Apr. 7, 2020) at 1, Haas Decl., Ex. 4. Equally concerning, it appears that bond offices in Newark, New Jersey and New York City have closed, limiting access for a detainee's family to secure bond in the event an IJ grants release.  *See* Arcia-Quijano Decl. ¶ 17, ECF No. 22.5.

It is during this unprecedented and troubling time, riddled with uncertainty, that Petitioners bring the instant motion.

### B.    Petitioners' Pre-Existing Medical Conditions

Petitioners are presently subject to immigration removal proceedings at the Varick Immigration Court and detained at ICE's discretion under 8 U.S.C. § 1226(a) at either the Hudson County Correctional Facility ("Hudson County Facility") or the Bergen County Correctional Facility ("Bergen County Facility," or together with the Hudson County Facility, the "Facilities") in New Jersey.  Petition ¶¶ 1, 6-10.  As described below, each Petitioner suffers from pre-existing medical conditions that no one disputes heighten their risk for serious health consequences if they contract COVID-19.  *See id.*

### i.    Cristian A.R.

Cristian A.R. is thirty-three years old and has been detained at the Hudson County Facility since January 2020.  Petition ¶ 6; Kim Decl. ¶¶ 2, 4, ECF No. 13.2.  He has hypertension and Type 2 diabetes for which he has been prescribed daily medication and insulin shots.  Kim Decl. ¶ 7. He submits that, while detained at the Hudson County Facility, he has had at least eleven blood sugar level readings over the American Diabetes Association's recommended range for

nonpregnant diabetic individuals.  *Id.* ¶¶ 7-8.  He has recently experienced "extremely painful headaches and partial face paralysis."  *Id.* ¶ 9.

> ### ii.     Fedor B.

Fedor B. is a thirty-five-year-old Russian national who has been detained at the Bergen County Facility since December 3, 2020.   Petition ¶ 7; Ostolaza Decl. ¶ 4, ECF No. 13.3; Eisenzweig Decl. ¶ 1, ECF No. 22.3.  He applied for asylum upon entering the United States on a visa three years ago, and before his detention, lived in New York City.  Ostolaza Decl. ¶ 4.  Fedor B. suffers from a number of ailments, including "asthma, high blood pressure, chronic hepatitis B, acute prostatitis (deep infection of the prostate), and post-operative complications of hemorrhoid surgery."  *Id.* ¶ 5.  Of those conditions, his prostatitis is "so severe that it was [] not responding to multiple courses of antibiotics."  *Id.*  In addition, he has "constant pain, intermittent bleeding due to hemorrhoids, and frequent urination" and a weakened immune system.  *Id.*

> ### iii.     Santiago C.C.

Santiago C.C. is a thirty-six-year-old Ecuadorian national who has been detained at the Bergen County Facility since February 2020.  Petition ¶ 7; Ostolaza Decl. ¶ 9.  Santiago C.C. has had hypertension for the past six years and has kidney stones.  Ostolaza Decl. ¶ 10.  He recently received treatment from an external clinic, where a physician "prescribed him pain medication and recommended that he receive surgery for the kidney stones."  *Id.*

> ### iv.     Noe C.M.

Noe C.M. is forty years old and has been detained at the Bergen County Facility since August 5, 2019.  Petition ¶ 9; Kim Decl. ¶ 11.  He was recently diagnosed with Bell's Palsy for which he was prescribed Prednisone, "an oral steroid" that purportedly suppresses his immune system.   Petition ¶ 9; Kim Decl. ¶ 16.   A doctor informed Noe C.M. that "he had experienced

symptoms of a stroke" from stress and that his condition "would take about 6 months to a year to recover." Gordillo Decl. ¶ 6, ECF No. 22.2.  Since then, "the numbing on his face has not stopped." *Id.* ¶ 8.  In late March of this year, Noe C.M. "started getting a fever and nose bleeds," which persisted into early April.  *Id.* ¶¶ 7-8.

       **v.**    **Alvaro N.M.**

Alvaro N.M. is fifty-nine years old and has been detained at the Hudson County Facility since March 2019.  Petition ¶ 10; Kim Decl. ¶¶ 18-19.  About five years ago, Alvaro N.M. had a heart attack.  Petition ¶ 10; Kim Decl. ¶ 22.  He suffers from Type 2 diabetes, hypertension, and high cholesterol for which he has been prescribed daily medication and insulin injections.  *Id.* While detained at the Hudson County Facility, Alvaro N.M.'s "blood sugar has been higher than normal" and he has "felt that his condition is deteriorating."  Durkin Decl. ¶¶ 4-5, ECF No. 22.4.

**C.**    **The Hudson and Bergen County Facilities' COVID-19 Prevention and Management Measures**

It is undisputed that COVID-19 is spreading quickly through the Bergen and Hudson County Facilities.  Bergen County Warden Steven Ahrendt indicated that as of 9:00 a.m. on April 8, 2020, two ICE detainees, one inmate, and sixteen corrections officers have tested positive for the virus and six ICE detainees, and eleven inmates are suspected of having contracted the virus. Ahrendt Decl. ¶ 9.M., ECF No. 20.4.  The numbers of those infected at the Hudson County Facility are even more grim.  According to Director Ron Edwards, as of 5:00 p.m. on April 6, 2020, two ICE detainees, twenty-four county and federal inmates, and fifty-eight staff members have tested positive for COVID-19.  Edwards Decl. ¶ 19, ECF No. 20.5.  One corrections officer and two nurses have died.  *Id.*  Neither Facility provides even an estimate of suspected positive cases, due in part, to lack of testing.  Based on recent guidance, reports, and observations, describing the

particular vulnerabilities of detention and correctional centers for COVID-19 outbreak, the number of suspected and confirmed cases and casualties is certain to rise.[14]

Respondents maintain that the Facilities have implemented "preventative measures against the spread of COVID-19" and "ICE has implemented procedures and protocol to protect the detainees and staff in its care at [the Facilities.]"  Gov. Br. at 22, 24, ECF No. 20.  Based on a review of the certifications submitted by the Warden Ahrendt and Director Edwards, it appears that, for purposes of this opinion, those measures are best explained in two categories: external prevention and internal prevention and management.

### i.    External Prevention

The Facilities have taken precautions to mitigate the risk of COVID-19 exposure arising from external influences.   The Bergen County Facility has indefinitely suspended all ICE detainee intakes and screens new county inmates, staff members, and vendors for the virus.   Ahrendt Decl. ¶¶ 9.A., 9.B., 9.D.   The Hudson County Facility is still accepting ICE detainees, with exceptions, and detainees, inmates, vendors, and staff are subject to medical evaluations before entering the Facility.  Edwards Decl. ¶¶ 12.B.i., 12.B.ii., 12.B.vii.  Both Facilities have suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys.  Ahrendt Decl. ¶ 9.C; Edwards Decl. ¶¶ 12.D.i, 12.H.-J.

---

[14] *See* CDC Interim Guidance at 2 (listing the "components" that "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors"); *see also* Greifinger Decl. ¶¶ 4, 13 (explaining that once it is introduced, COVID-19 "spreads like wildfire" through detention facilities, and noting the "severe lack of testing capacity nationwide"); Timothy Williams, et. al., *'Jails are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, THE NEW YORK TIMES (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (describing the "rapid spread" of COVID-19 across United States jails and prisons).

### ii.     Internal Prevention and Management

In addition to their efforts at preventing exposure from external factors, the Facilities have taken affirmative steps to lessen the risk of COVID-19 exposure and transmission within the jails.

### 1.     Social Distancing and Cleaning

At the Bergen County Facility, all detainees must remain in their cells at all times, "except for a thirty-minute period each day when they are permitted to exit the cell area."  Ahrendt Decl. ¶ 9.E.  To promote social distancing, during that thirty-minute period, "only four inmates/detainees are permitted to leave the cell area" where they have "2643 square feet of space" for recreational use and showering.  *Id.*  Detainees and inmates have meals inside their cells to avoid congregating. *Id.* ¶ 9.K.  With respect to cleaning and hygiene, "[a]ll housing units are sanitized no less than four times per day."[15] *Id.*  Respondents also indicate that "[t]he Facility provides disinfectant spray, hand sanitizer, and soap in every housing unit," *id.*, but do not claim that the detainees have access to those cleaning and hygienic supplies.  To the contrary, as discussed *infra*, detainees complain that they have little, if any, access to basic hygiene products and no access to cleaning supplies.

The Hudson County Facility has implemented a "[r]estrictive schedule," permitting one "tier . . . out in the morning and the other portion . . . out in the afternoon, rotating daily."  Edwards Decl. ¶ 11.  As a social distancing measure, beginning on March 21, 2020, the "recreation period" is now staggered to permit only two "inmates/detainees" to leave their cells for a thirty-minute recreational-use period.  *Id.* ¶ 12.K.  Detainees have meals inside their cells to prevent congregation.  *See id.* ¶¶ 12.E, 13.E.  With respect to cleaning and hygiene, the Hudson County Facility "lock[s] down" each housing unit in between shifts for cleaning and sanitization, which

---

[15] Based on this cleaning schedule and the number of persons in the shared spaces every thirty minutes, it follows that close to fifty inmates and detainees pass through common areas, potentially coming into contact with contaminated surfaces before they are routinely cleaned.

occurs, at a minimum, three times per day.  *See id.*  ¶¶ 11, 12.E.[16]  The Hudson County Facility also reports that it cleans the recreation areas "constantly" each day, *id.* ¶ 12.K, but does not state when, how often, and what that cleaning entails.  It has provided its staff with Personal Protective Equipment ("PPE").  *Id.* ¶ 13.C.  *See id.* ¶ 12.D.iv.

## 2.   Medical Response, Quarantine, and Isolation

Both Facilities follow nearly identical isolation and quarantine protocols for confirmed and suspected cases of COVID-19.  Confirmed cases that do not require hospitalization are isolated in a designated area.  Ahrendt Decl. ¶ 9.H.; Edwards Decl. ¶ 15.  Symptomatic inmates or detainees who are awaiting test results are quarantined.  Ahrendt Decl. ¶ 9.H.; Edwards Decl. ¶ 16.  Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for fourteen-day period.  Ahrendt Decl. ¶ 9.I.; Edwards Decl. ¶ 17.  Cohorting ends if no new COVID-19 case develops within that period.  *Id.*

Each Facility also has an on-site physician who is on-call 24/7 for emergencies.  Ahrendt Decl. ¶ 7; Edwards Decl. ¶ 7.  Detainees and inmates at the Facilities are able to make daily sick calls to on-site medical staff.  Ahrendt Decl. ¶ 9.G.; Edwards ¶ 12.D.iii.  If detainees or inmates complain of illness, medical staff evaluates them.  Ahrendt Decl. ¶ 9.G.; Edwards ¶ 14.  Those who present with COVID-19 symptoms are provided a "surgical mask."  *Id.*  The Bergen County Facility indicates that detainees and inmates may be transported to a hospital for evaluation but does not describe the circumstances under which that option is exercised.  *See* Ahrendt Decl.

---

[16] Based on this cleaning schedule and the number of persons in the shared spaces every thirty minutes, it follows that over thirty inmates and detainees pass through common areas, potentially coming into contact with contaminated surfaces before they are routinely cleaned.  Both Facilities indicate that they have provided education to inmates and detainees and have posted informative signs on COVID-19 and best practices to prevent its transmission, *see* Ahrendt Decl. ¶ 9.L.; Edwards Decl. ¶ 12.D.iii, but do not state when and how often education has been provided.

¶ 9.G.  It also does not state whether high-risk detainees like Petitioners are subject to those same procedures, or whether the Facility makes other accommodations based on their needs.

The Hudson County Facility uses some form of COVID-19 testing on inmates. *Id.* ¶ 15. As for detainees and inmates with "underlying health conditions," the Hudson County Facility "[e]stablished a protocol" that includes "daily monitoring" and establishing "a plan to remove [them] from the rest of the population if determined to be necessary" from the Facility's "Medical Department." *Id.* ¶ 12.G.iv.  No explanation of what constitutes an "underlying health condition" or information on whether the Facility makes specific accommodations for at-risk individuals is provided.

### D.   Petitioners' Experiences in the Facilities

During oral argument, the Government highlighted that the protocols implemented in the Bergen and Hudson County Facilities are objectively better than those employed at other detention centers.  This may very well be true.  Nonetheless, Petitioners' direct experiences in the Facilities tell a different and less optimistic story and demonstrate that despite these enhanced measures, the Facilities are still woefully deficient in preventing exposure to and transmission of COVID-19, particularly among vulnerable detainees.  And their stories are not inconsistent with the sworn declarations submitted by Respondents.

Petitioners at the Bergen County Facility describe a lack of attention to their and other detainees' medical needs and basic hygiene.  For example, Fedor B. "has been confined to his cell for 23.5 hours each day."  Eisenzweig Decl. ¶ 4.  He notes that his cell is "damp and cold" and the water from the sink, "from which he has to drink," appears to be "dirty[] [and] dotted with black material."  *Id.* ¶ 5.  These conditions "have exacerbated his allergies and asthma, and he has been coughing frequently."  *Id.*  Further, Fedor B. indicates that presently neither his cell nor nearby

cells have been sanitized or cleaned, and the Bergen County Facility has "refused to provide him with any cleaning supplies that would allow him to clean his own space." *Id.* ¶ 6. Consequently, the floor of the cell "is grimy and the toilet—which is open to the cell and next to his bed—has not been sanitized in the last two weeks." *Id.* Notwithstanding his daily requests, "the jail did not provide them with toothpaste for six days." *Id.* ¶ 7. He is able to do "one small bag" worth of laundry once per week, and for that reason, "his bedding is seldom washed." *Id.* ¶ 8. He has washed his undergarments "in a bucket in his cell, using the single bar of soap" that he was forced to share with his cellmate. *Id.* To make matters worse, when that bar of soap was finished, he requested a new one, and as of April 8, he "was still waiting for another bar." *Id.* Without access to soap, he cannot perform the simplest measure of preventing the spread of COVID-19—washing his hands.

With respect to his medical needs, Fedor B. reports that on one instance he waited two days after making a sick call before a nurse responded. *Id.* ¶ 11. The responding nurse did not wear a mask. *Id.* His requests for an asthma pump and stronger allergy medication were not met. *Id.*

Fedor B. also shares his account of interactions with and exposure to others at the Bergen County Facility. Most disturbingly, during the thirty minutes they are permitted to leave their cell, he and his cellmate "are in contact with the occupants of another cell and several guards." *Id.* ¶ 10. He is "forced to touch" certain high-contact objects and surfaces, like showers, phones, screens, chairs, and handles, some of which he admittedly "has seen being cleaned about three times a day."[17] *Id.* He "has never seen a guard wear a mask," but only gloves. *Id.* During meals, his food is cold, sparse, and brought to him by "working detainees," who wear gloves but not masks. *Id.*

---

[17] The Eisenzweig Declaration does not indicate which objects and areas Fedor B. has seen cleaned or when he has seen them cleaned.

¶ 13.   He indicates that medical staff and officers have not disseminated any information or guidance "about how to prevent the spread of the virus." *Id.* ¶ 12.

Santiago C.C. shares a similar experience at the Bergen County Facility.  He states that detainees "are using and touching the same bathroom/shower area, kitchenette area, and the phone" outside of their cells.  Arcia-Quijano Decl. ¶ 5, ECF No. 22.5.  The Bergen County Facility has not provided detainees with masks, gloves, or cleaning supplies.  *Id.* ¶¶ 6, 8.  His cell is not being "regularly sanitized" and "no other jail staff comes to the cells to clean." *Id.* ¶ 8.  He and other detainees have thus "resorted to using shampoo to clean their cells." *Id.*  Like Fedor B., he indicates that laundry is done only once per week, and "[l]aundry for bedsheets has not been done in around two weeks." *Id.* ¶ 7.  As a result, "he has been forced to attempt to wash them in his cell." *Id.*

Santiago C.C. reports that the return time for detainee sick calls seeking medical attention has been longer since the pandemic began.  *See id.* ¶ 10.  On one occasion, he waited eight hours before he was taken to an outside clinic for stomach pain, and was later diagnosed with kidney stones. *Id.*  At least once, he was not given his hypertension medication.  *See id.* ¶ 12.  Nurses and guards at the facility wear gloves but rarely, if ever, wear face masks. *Id.* ¶¶ 11-12.

Noe C.M., a Bergen County Facility detainee who suffers from Bell's Palsy and has had symptoms of a stroke, was not seen by medical personnel for days despite these conditions. Gordillo Decl. ¶ 8.  He states that only some Facility personnel wear face masks. *Id.* ¶ 11.  He recalls a specific instance of witnessing another detainee "collapse to the floor" and being taken out of the facility in a stretcher to a hospital. *Id.*  ¶ 10.  In total, "he has seen about 4 detainees taken out on stretchers and 2 detainees taken to the emergency department because they had the virus." *Id.*  He states that the staff are "not ensuring that people received medical treatment for

most health issues." *Id.* He indicates that the jail is "low on staff and that detainees ha[ve] limited access to services." *Id.* ¶ 9.

At least one Petitioner detained at the Hudson County Facility raises similar concerns to those detained at the Bergen County Facility. Alvaro N.M. states that despite the typical thirty minutes he is permitted to leave his shared cell per day, many days he has had to wait 36 hours before permitted to leave for that brief thirty-minute period. *See* Durkin Decl. ¶ 6, ECF No. 22.4. Although he is a Type-2 diabetic, Alvaro N.M. receives his insulin at inconsistent times each day, and often after he has eaten, causing his blood sugar to rise. *Id.* ¶¶ 4, 7. As a result, he has experienced "worsening dizziness and fatigue." *Id.* ¶ 7. He also indicates that he is no longer receiving meals from a designated-diet menu, originally ordered due to his diabetes, hypertension, and high cholesterol, and instead receives "regular meals." *Id.* ¶ 8. He expressed concerns about receiving regular meals but was told that they are "the only meal[s] available." *Id.* Alvaro N.M. has noticed that only the medical staff wear masks. *See id.* ¶ 9. He was given a mask on April 6, 2020 but "has never been provided with gloves or any type of sanitizing products." *Id.* He has not had his temperature taken since on or about March 31, 2020. *See id.* ¶ 12.

Coupled with Petitioners' experiences are the following facts submitted by Respondents describing the Facilities' intake and post-intake quarters: Petitioners share bunk-bed-style cells with at least one other roommate, *see* Ahrendt Decl. ¶ 6; Edwards Decl. ¶ 10; "apart from the beds," there is "70.6 square feet" in the cells at the Bergen County Facility, Ahrendt Decl. ¶ 6;[18] and the Hudson Facility still operates "Bullpens" of "9 inmates," which are located in the "Intake/Discharge area" where new detainee intakes and pre-admission medical screening of detainees occur. *See* Edwards Decl. ¶¶ 12.A., 12.B.i, 12.B.v., 12 B.vi.

---

[18] It appears that the square footage of the cells shared by detainees at the Hudson County Facility is not included in the Government's response or attached declarations.

Petitioners' underlying medical conditions, their direct accounts of the conditions under which they live, and the undisputed fact that COVID-19 has spread through the Facilities demonstrate that even under the improved protocols implemented at the Facilities, "there are certain realities that neither [the Facilities] nor ICE can overcome." *Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *8 (D.N.J. Apr. 9, 2020).

## II.   LEGAL STANDARDS

### A.   Preliminary Injunction

Motions for temporary and preliminary injunctive relief are governed by a four-factor test. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." *Id.* This showing must be "significantly better than negligible but not necessarily more likely than not." *Id.* The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief. *Id.* If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179. The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. *Id.* at 179.

### B.   The "Extraordinary Circumstances Standard" for Bail

The parties agree that the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) establishes that "extraordinary circumstances" are required before "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition." *Id.* at 367. Citing *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), the Third Circuit in *Lucas* noted that extraordinary

circumstances may be established where the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill. *Id.* at 366-67. The panel, however, did not expressly limit the finding of extraordinary circumstances to situations involving a petitioner's poor health. *Id.* at 367. Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy. *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017). Recent decisions have applied this standard to determine whether extraordinary circumstances exist in the context of the COVID-19 pandemic to grant bail to immigration habeas petitioners. *See, e.g.*, *Rafael L.O.*, 2020 WL 1808843, at \*5; *Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at \*8 (S.D.N.Y. Mar. 27, 2020) (applying an analogous Second Circuit standard set forth in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001)).

## III. DISCUSSION

The Court finds that Petitioners have met the standard for a preliminary injunction and have likewise met the extraordinary circumstances standard for granting bail in a habeas matter.

### A. Preliminary Injunction

#### 1. Likelihood of Success on the Merits of Petitioners' Constitutional Claims

Respondents argue that Petitioners cannot succeed on their conditions of confinement and medical claims because such challenges are not properly brought through habeas. *See* Gov. Br. at 18-19, 27. Federal courts, however, including the Third Circuit, have condoned conditions of confinement challenges through habeas. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir.

2014); *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978).  Likewise, the Supreme Court has repeatedly left open the question of whether detainees may challenge their confinement conditions via a petition for a writ of habeas corpus.  *See Bell v. Wolfish*, 441 U.S. 520, 526, n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."); *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862-63 (2017) (explaining that the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief for immigration detainees challenging a detention policy than a suit for money damages, as a successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately).

Furthermore, under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).  Petitioners in this action claim that their continued detention in their current conditions of confinement violates due process.  Accordingly, this Court finds that Petitioners may challenge their conditions of confinement through a 28 U.S.C. § 2241 petition for writ of habeas corpus.

Respondents next assert that Petitioners cannot establish a likelihood of success on the merits of their constitutional claims because they are lawfully detained pursuant to the discretionary detention statute, which permits detention of individuals in removal proceedings

before a final order of removal.  Gov. Br. at 20-21 (citing 8 U.S.C. § 1226(a)).[19]  Petitioners,

however, have not asserted that they have a procedural or substantive due process right to be

released on bond pursuant to 8 U.S.C. § 1226(a); rather, they have asserted claims for violations

of their substantive due process rights, arguing that their conditions of confinement amount to

punishment under the Due Process Clause and that Respondents' policies evince deliberate

indifference to their serious medical needs.[20]

The Court first considers whether Petitioners have a likelihood of success on the merits on

their claims that their conditions of confinement at the Facilities amount to punishment.  Because

Petitioners are civil detainees as opposed to prisoners who have been convicted and sentenced,

their conditions of confinement claims are analyzed under the Due Process Clause of the Fifth (or

Fourteenth) Amendment, as opposed to the Eighth Amendment.  *See Bell*, 441 U.S. at 535-36.

---

[19] Indeed, the Attorney General has the discretion to either: (1) detain the person without bond; or (2) release the person on a bond of at least $1,500.00 or on conditional parole.  8 U.S.C. § 1226(a).  In making the initial bond determination, an ICE officer must assess whether the person has "demonstrate[d]" that "release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id.* § 236.1(c)(8).  If the ICE officer determines that release, with or without bond, is not appropriate, then the person may appeal to an IJ. *Id.* §§ 236.1(d)(1), 1003.19, 1236.1(d)(1).  The IJ's decision, then, would be appealable to the Board of Immigration Appeals. *Id.* §§ 1003.1(b)(7), 1003.19(f), 1003.38.  If the Attorney General fails to provide a bond determination or redetermination, the district court has the power under Section 2241 to direct an immigration court to provide it.  As discussed later in this Opinion, the evidence presented by Petitioners shows that bond hearings are not being conducted in an expedient manner due to the COVID-19 pandemic.

[20] Respondents emphasize that they have lawfully exercised their discretionary authority to detain Petitioners during their removal proceedings.  This detention triggers a corresponding obligation under the Constitution to provide for Petitioners' reasonable safety and medical needs:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . .The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment. . . .

*Helling v. McKinney*, 509 U.S. 25, 32 (1993) (alterations in original and internal quotation marks omitted) (considering the rights of convicted prisoners) (quoting *DeShaney v. Winnebago Cty. Dept. of Soc. Svcs.*, 489 U.S. 189, 199-200 (1989)).  This same rationale applies here because a detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner."  *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

Convicted and sentenced prisoners are protected from punishment that is "cruel and unusual," while pretrial and civil detainees are protected from any punishment. *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005). The law in the Third Circuit is clear that civil immigration detainees are entitled to the "same due process protections" as pretrial detainees with respect to conditions of confinement. *See E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). An immigration detainee can bring a claim for violation of those protections when the conditions of confinement fall below constitutional minimums. *Id.*

In *Helling*, the Supreme Court held that exposure to environmental tobacco smoke states an Eighth Amendment cause of action even though the inmate was asymptomatic because the health risk posed by involuntary exposure to second-hand smoke was "sufficiently imminent." *Id.* at 35. As relevant to Petitioners' conditions claims, *Helling* also recognized that inmates are entitled to relief under the Eighth Amendment where they prove threats to personal safety from exposure to serious contagious diseases:

> In *Hutto v. Finney*, 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

*Id.* at 33.[21]

---

[21] Courts interpreting this language have held that inmates can state an Eighth Amendment claim for confinement with inmates who have a serious contagious disease that is spread by airborne particles, such as tuberculosis. *See Bolton v. Goord*, 992 F. Supp. 604, 628 (S.D.N.Y. 1998) (citing *Helling*, 509 U.S. at 33, for the proposition that "[t]he practice of putting inmates who have serious communicable diseases together is actionable under the Eighth Amendment," but rejecting the petitioner's claim because there were no cases of active tuberculosis cases among inmates since the practice of "double celling" began).

*Helling* provides the theory for Petitioners' conditions claim but not the legal standard. Because Plaintiffs are immigration detainees and not convicted prisoners, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective.  If they are not, the Court may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'"  *Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).  A complained-of condition or deprivation amounts to punishment if: "the disability is imposed for the purpose of punishment"—that is, there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; *or* the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

The Court's "inquiry into whether given conditions constitute 'punishment' must consider 'the totality of circumstances within an institution.'"  *Hubbard*, 399 F.3d at 160 (quoting *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir.1983)).  In *Bell*, for instance, the Supreme Court held that "double-bunking" of inmates under the circumstances there did not constitute punishment where the pretrial detainees had sufficient space for sleeping and using common areas, and the average length of incarceration was sixty days.  441 U.S. at 541-43.  Double-bunking thus did not violate the pre-trial detainees' due process rights.  The Court cautioned, however, that different circumstances might produce a different result: "[C]onfining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment."  *Id.* at 542.

Addressing this question in light of the COVID-19 pandemic, in *Thakker v. Doll*, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020), Judge Jones reasoned that placing immigration detainees in close proximity and in unsanitary conditions did not meet a legitimate governmental objective.   He further explained that although preventing civil immigration detainees from absconding, standing alone, constituted a legitimate governmental aim, this objective was deeply weakened in light of the COVID-19 pandemic, particularly when ICE had many other options to monitor civil detainees.  *Id.*

Just this week, Judge Vasquez reached a similar conclusion in *Rafael L.O.*  There, he found that the conditions of confinement at Essex County Correctional Facility ("ECCF"), including the volume of ECCF detainees confined to inherently limited living and sleeping quarters, limited access to hygiene products, shared bathroom facilities, and the transmission of COVID-19 to detainees in custody, amounted to punishment of the Petitioners, who had underlying medical conditions that made them vulnerable to serious complications or death if they contract the virus. *Rafael L.O.*, 2020 WL 1808843, at *7-8.   Judge Vasquez further determined that "[t]he Respondents [did not] have an express intent to punish Petitioners" but found "that such intent is not a necessary prerequisite" to a claim under *Bell*.  *Id.* at *7.

The reasoning of *Thakker* and *Rafael L.O.* apply with equal force here.  The totality of the circumstances compel a finding that the conditions of confinement at the Facilities are tantamount to punishment and therefore unconstitutional.

Respondents do not dispute that Petitioners are medically vulnerable such that they may have an up to a 20% chance of death if they contract COVID-19.  *See* Greifinger Decl. ¶ 5.  These odds are worse than a game of "'Russian roulette.'"  *Coreas v. Bounds*, No. 20-780, 2020 WL 1663133, at *12 (D. Md. Apr. 3, 2020) (observing the risks of death to vulnerable detainees from

COVID-19).  There has been a significant growth in confirmed or suspected cases at the Facilities since this case was filed.  *See* Pet. Reply Br. at 2-3, ECF No. 22 (observing that between April 1 and April 8, "the number of positive or suspected detainees and staff has nearly quadrupled" at the Bergen County Facility, and between April 1 and April 6, "the number of positive COVID-19 cases has grown from 28 to a whopping 84 confirmed cases among detainees and staff" at the Hudson County Facility).  Tragically, two nurses and one corrections officer at the Hudson County Facility have already died.

Given the heightened risk of COVID-19 exposure, the CDC Guidelines have made clear that correctional facilities must make "all possible accommodations" to prevent transmission of infection to high-risk individuals.  CDC Interim Guidance at 16, 20.  But despite the laudable, general protocols implemented generally at Bergen and Hudson County Facilities, Respondents do not point to any specific protocols to protect medically-vulnerable people in their custody.  Nor do they contest the lack of available testing, and neither Facility indicates that it has sufficient testing supplies.  Additionally, the Facilities' declarations confirm that they are not testing asymptomatic individuals, even though those individuals can transmit the virus.  *See* Ahrendt Decl. ¶¶ 9.H. & 9.I; Edwards Decl. ¶ 17.  And, while they concede to cohorting those who have had a known exposure to the virus, they do not indicate whether high-risk individuals like Petitioners are ensured separation or adequate space from others in the cohorting environment.  Thus, to the extent Respondents have taken measures to address the pandemic within the Facilities, they have not ensured protection for the most vulnerable people within their care.

While Respondents have taken some proactive measures to address the crisis, and the conditions in place at the Facilities appear to be better than those in *Thakker* and *Rafael L.O.*, the enhanced measures are still insufficient.  Petitioners spend 23.5 hours a day in cramped cells that

they have to share with another person and the remaining thirty minutes out of their cells in common areas.  It is during those thirty minutes that the detainees are at high risk for COVID-19 exposure and transmission.  That brief period is the only time they have each day to take showers, make telephone calls to family members and attorneys, visit the commissary, and use recreation areas.  Coming into close contact with frequently used items and shared spaces is unavoidable. Respondents do not state the Facilities clean and sanitize the common areas and frequently-touched common items in-between each period during which new detainees and inmates leave their cells. Instead, they provide that cleaning occurs at least three or four times per day.  *See* Ahrendt Decl. ¶ 9.K; Edwards Decl. ¶¶ 11, 12.E.  Accordingly, even crediting the Facilities' increased efforts to clean and disinfect shared spaces, Respondents cannot dispute that many, if not all, detainees use the common areas and objects in-between cleanings and are being exposed to potentially contaminated surfaces.  Detainees also report that corrections officers' and medical staff's use of gloves and masks is inconsistent and certainly not in line with the CDC's recommendations, further compounding their risk of exposure.  *See* Arcia-Quijano Decl. ¶ 5; Gordillo Decl. ¶ 11; Durkin Decl. ¶ 9.

To make matters worse, detainees who want to do their part in curtailing the spread of COVID-19 to themselves and others are not provided the resources to do so.  Detainees are forced to share soap or have no soap at all, *see, e.g.*, Eisenzweig Decl. ¶ 8, and lack other basic hygiene items like hand sanitizer.  Respondents do not indicate whether and how often soap or other hygiene products are provided to detainees.  That means, when they return to their cells to begin their next 23.5-hour period of confinement, detainees are unable to perform the most effective measure of combatting the spread of the virus: washing and disinfecting their hands.  Showering is not an option because their only access to showers is during their brief half-hour recreational

period.  Covering their faces with masks or hands with gloves is also not possible, unless they have already shown signs of COVID-19, but by that time, avoiding infection is likely too late. *See* Ahrendt Decl. ¶ 9.G.; Edwards ¶ 14.  And, because the Facilities have not provided detainees cleaning supplies, *see, e.g.*, Eisenzweig Decl. ¶¶ 6-8, 10; Gordillo Decl. ¶ 11; Arcia-Quijano Decl. ¶¶ 6-8, 11-12; Durkin Decl. ¶ 9, detainees are forced to remain in cramped, dirty quarters, lest they use their shampoo or soap, if they have any, to clean their shared cells and toilets or their laundry, *see* Arcia-Quijano Decl. ¶ 8; Eisenzweig Decl. ¶ 8.  But even that last-ditch effort will not eliminate the threat of contamination from a potentially-infected roommate, who is responsible for his own hygiene.  All of these glaring gaps in the Facilities' prevention and management protocols have been left open and unchallenged by Respondents.

Finally, while the Court is sympathetic to the increased burden on medical staff to attend to each detainee's medical needs, inadequate care aggravates the already heighted risk COVID-19 poses to vulnerable detainees.   Detainees report that they are either irregularly receiving medications critical to treating the conditions that put them at higher risk for severe illness from the virus, like insulin for diabetes, *see* Durkin Decl. ¶¶ 1,7, or not receiving those medications at all, *see* Arcia-Quijano Decl. ¶ 12 (hypertension medication); Eisenzweig Decl. ¶ 11 (asthma pump).  Some indicate that, while the Facilities permit them to make daily sick calls, those calls are often left without response for significant periods of time.  *See* Arcia-Quijano Decl. ¶ 10; Eisenzweig Decl. ¶ 11.  The Court raises these medical care issues to highlight the extraordinary circumstances surrounding Petitioners' detainment during this global crisis.[22]

---

[22] Civil detainees also have a constitutional right to a prison policy ensuring adequate health care, and such claims are governed by the deliberate indifference standard.  *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm).  Because the Court finds that Petitioners are likely to

Here, having viewed the totality of the circumstances, the Court finds that Petitioners are likely to succeed on their claim.  By failing to implement the CDC's instructions for the most vulnerable individuals, and by detaining those persons in a jail setting during a rapidly accelerating COVID-19 pandemic without providing them with adequate means to follow hygiene and other health protocols, Respondents have placed Petitioners at a substantially enhanced risk for severe illness or death.  There can be no greater punishment.  Accordingly, the Court is satisfied Petitioners have demonstrated that Respondents' conduct amounts to punishment under the Due Process Clause.

### 2. Irreparable Harm

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief.  *See Reilly*, 858 F.3d at 179.  Respondents appear to argue that Petitioners cannot meet the irreparable harm requirement because their likelihood of contracting COVID-19 is speculative.  *See* Gov. Br. at 26, 33-36.  The Court disagrees.

As the Supreme Court observed in *Helling*, "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  509 U.S. at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").  The Court rejects Respondents' argument that the risk of harm to these Petitioners is speculative.

Petitioners, who all suffer from underlying medical conditions, may have a 20% chance of death if they contract COVID-19 (according to preliminary data from China), and they are detained in facilities where the virus is still spreading and where they "cannot practically adhere to social

---

succeed on their claim that the conditions of confinement at the Facilities amount to punishment, the Court need not decide whether Petitioner can establish deliberate indifference to their serious medical needs.

distancing guidelines or the adequate level of personal hygiene, that have been touted as the most effective means to thwart the spread of the virus." *See Rafael L.O.*, 2020 WL 1808843, at *8. The cases to which Respondents cite are readily distinguishable on this basis. *Francisco M. v. Decker*, No. 20-2176 (D.N.J. Mar. 25, 2020), *see* Gov. Br. at 3, 19, 20, 34, 35, involved a detainee who was not medically vulnerable to COVID-19, and, in an order granting expedited briefing on the merits of his petition, the court opined that the harms he alleged, at that time, were "speculative" when there were only two cases at the jail where he was housed. *See Francisco M.*, No. 20-2176, ECF No. 11 at 3-4. Similarly, *Nikolic v. Decker*, No. 19-6047, 2020 WL 1304398 (S.D.N.Y. Mar. 19, 2020), *see* Gov. Br. at 18, 19, 36, was decided before the confirmed outbreak of COVID-19 at area jails. Moreover, in that case, the court directed Mr. Nikolic to file a new petition seeking immediate release, which he did, and the court granted his immediate release last week. *See Nikolic*, No. 20-2500 (Tr. of Oral Decision) at 18-22, Haas Decl., Ex. 2.

Against this backdrop, Petitioners have demonstrated irreparable harm should they remain in confinement. *Rafael L.O.*, 2020 WL 1808843, at *8; *Thakker*, 2020 WL 1671563 at *7 ("[C]atastrophic results may ensue, both to Petitioners and to the communities surrounding the Facilities."); *see also Hope v. Doll*, No. 20-562 (M.D. Pa. Apr. 7, 2020) ("We cannot allow the Petitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction."); *Coronel*, 2020 WL 1487274, at *8 (finding that "[d]ue to their serious underlying medical conditions" and their placement in immigration detention, where they are "at significantly higher risk of contracting COVID-19," the petitioners "face a risk of severe, irreparable harm"). The Court therefore finds that Petitioners have demonstrated irreparable harm should they remain incarcerated at the Facilities.

### 3.    Balancing of the Equities

"Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merch Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted).  Here, the Court finds the potential of injury to Petitioners is high for the reasons set forth above.  Notably, the public interest also supports the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems.  *See Rafael L.O.*, 2020 WL 1808843, at *9.

Respondents also have a legitimate interest in ensuring that Petitioners do not flee and in protecting the public.  As Judge Vasquez found in *Rafael L.O.*, the Court believes that it can address those very important interests in fashioning appropriate conditions of release for each Petitioner.  *See id.*  In that regard, Petitioners in this matter are each discretionally detained by ICE under 8 U.S.C. § 1226(a).  Among them, they have no pending charges, and all have significant ties to this country such that they can be safely released on reasonable conditions of supervision.  For those with the most serious criminal histories, the Court will impose the most stringent conditions of release, including electronic monitoring.

Fedor B. has never been criminally arrested.  Ostolaza Decl. ¶¶ 4, 6.  Noe C.M.'s two criminal convictions are for driving while intoxicated and driving without a license and aggravated driving while intoxicated and unlicensed operation.  Kim Decl. ¶ 15.  Santiago C.C. has been arrested twice in the fifteen years he has lived in the United States, resulting in only one conviction for driving while ability impaired, an infraction (a lower level offense than a misdemeanor) under New York law.  Ostolaza Decl. ¶ 11; RAP Sheet, Ex. 8.  Santiago C.C. disputes the charges from

the second arrest, involving allegations by his wife, which were fully dismissed and sealed in January 2020.  *See* Bond Evid., Ex. 9.  Cristian A.R. has a single arrest and conviction for attempted endangering the welfare of a child, a misdemeanor under state law, for which he received a one-year conditional discharge sentence and no term of incarceration.  *See* Kim Decl. ¶¶ 4-6.  Finally, Alvaro N.M. is fifty-nine years old and was last arrested for a felony twenty-eight years ago.  Although his convictions involve very serious offenses, they date from the early 1990s, and are so temporally distant that they do not subject him to mandatory immigration detention. His only arrests in the last twenty years have been for failures to register as a sex offender in 2002 and 2007 related to the 1990s' felony convictions, and he has registered without incident every other year as required.  *See* Kim Decl. ¶ 21.

### B.    Extraordinary Circumstances Justify Releasing Petitioners from Detention

Petitioners in this matter are vulnerable to severe complications and death if they contract COVID-19 and are incarcerated in Facilities at the epicenter of the outbreak where they cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene to stop the spread of the virus.  These facts warrant the extraordinary remedy of release on bail, and make bail necessary, to make the habeas remedy effective.  *See Landano*, 970 F.2d at 1239.

The Court further notes that the current circumstances in the Varick Immigration Court render the bond hearing, which Petitioners requested in the alternative, an insufficient remedy. First, Respondents have made clear that they will not cooperate in the advancing of immediate bond hearings for Petitioners.  Gov. Br. at 2.  But even if the Court were to order Respondents to provide prompt bond hearings to Petitioners, the declarations of Petitioners' counsel strongly suggest that those bond hearings would not occur as scheduled, *see* Pet. Reply Br. at 21-22, and illustrate the severe impact on the New York Immigration Court due to COVID-19, *see* Oshiro

Decl. ¶¶ 30-52.   Also rendering bond hearings unlikely to occur is attorneys' inability to communicate with their clients, which is necessary to prepare them to testify and/or to review documentary evidence.  *See, e.g.*, *id.* ¶¶ 53-55; Zacarias Decl. ¶ 10; Gordillo Decl. ¶ 12.   Finally, even if Petitioners can have bond set, the bond offices in New York City and Newark are closed, and it is unclear where their families or friends would have to travel to post bond.  *See* Arcia-Quijano Decl. ¶ 17.   The Court finds that COVID-19's impact on the Varick Immigration Court, which has resulted in delays in bond proceedings, and the closure of bond offices in New York City and Newark, are extraordinary circumstances that weigh in favor of release under appropriate conditions for these medically-vulnerable Petitioners.

As to the conditions of release, the Court is satisfied that there are reasonable conditions that can adequately protect the public and ensure the Petitioners' appearance for future immigration proceedings.   The specific conditions of release are set forth in the Order accompanying this Opinion.

## IV.   CONCLUSION

For the foregoing reasons, Petitioners' Emergency Motion for Temporary Restraining Order, ECF No. 13, is **GRANTED**, and the Court orders Petitioners' immediate release subject to the conditions as ordered.   An appropriate Order accompanies this Opinion.


Dated:  April 12, 2020                              */s Madeline Cox Arleo*
                                                     **Hon. Madeline Cox Arleo**
                                                     **UNITED STATES DISTRICT JUDGE**